**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| GLORIA KEALY, | :: | MOTION TO VACATE |
| Movant, | :: | 28 U.S.C. § 2255 |
| | :: | |
| v. | :: | CRIMINAL NO. |
| | :: | 1:14-CR-0383-TWT-RGV-1 |
| UNITED STATES OF AMERICA, | :: | |
| Respondent. | :: | CIVIL ACTION NO. |
| | :: | 1:15-CV-3497-TWT-RGV |

<u>**FINAL REPORT AND RECOMMENDATION**</u>

This matter has been submitted to the undersigned Magistrate Judge for consideration of Gloria Kealy's motion to vacate, set aside, or correct her sentence pursuant to 28 U.S.C. § 2255, [Doc. 78], as amended, [Doc. 98], the government's response, [Docs. 83], and Kealy's reply, [Doc. 86]. Following a January 7, 2016, evidentiary hearing, and having considered the motion, the evidence presented, and the parties' post-hearing briefs, [Docs. 107, 108, 111], it is **RECOMMENDED** that Kealy's § 2255 motion be denied.

## I.  PROCEDURAL HISTORY

A federal grand jury in the Northern District of Georgia returned a four-count indictment against Kealy, charging her in Count One with misuse of a Social Security number, in violation of 42 U.S.C. § 408(a)(7)(B); in Count Two with use of a United

States passport obtained through a false statement in the application, in violation of 18 U.S.C. § 1542; and in Counts Three and Four with aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(1).  [Doc. 1].  Represented by retained counsel Jonathan R. Melnick ("Melnick"), Kealy entered a negotiated guilty plea to Counts One and Two.  [Docs. 47, 68].  The plea agreement included the following provision regarding the immigration consequences of Kealy's guilty plea:

> [Kealy] recognizes that pleading guilty may have consequences with respect to her immigration status if she is not a citizen of the United States.  Under federal law, a broad range of crimes are removable offenses, including the offense to which [Kealy] is pleading guilty.  **Indeed, because [Kealy] is pleading guilty to this offense, removal is presumptively mandatory.**  Removal and other immigration consequences are the subject of a separate proceeding, however, and [Kealy] understands that no one, including her attorney or the district court, can predict to a certainty the effect of her conviction on her immigration status.  **[Kealy] nevertheless affirms that she wants to plead guilty regardless of any immigration consequences that her plea may entail, even if the consequence is her automatic removal from the United States.**

[Doc. 47-1 at 4-5] (emphasis added).  Kealy signed the plea agreement and a separate certification section, which states in relevant part:

> I have read the foregoing Plea Agreement and have carefully reviewed every part of it with my attorney.  I understand the terms and conditions contained in the Plea Agreement, and I voluntarily agree to them.

[Id. at 13-14].

2

At her guilty plea hearing, Kealy confirmed that she had reviewed and signed the plea agreement. [Doc. 68 at 2-3]. The Court explained to Kealy the rights she was giving up by pleading guilty, and Kealy stated that she understood. [Id. at 5-7]. The government then noted on the record that the "plea agreement contains a removal provision that . . . puts [Kealy] on notice that she may face consequences with respect to her immigration status if she is not a citizen of the United States which we believe she is not." [Id. at 7]. Kealy acknowledged that no one had threatened or forced her to plead guilty and that no one had promised her anything not contained in the plea agreement. [Id. at 10-11]. Kealy also confirmed that she had sufficient time to "think about and discuss this matter fully with [her] attorney before entering a plea of guilty" and that she was satisfied with her attorney's representation. [Id. at 12]. Kealy understood that she was charged in Count One with using a "Social Security number to obtain a car loan," which was "not [hers] to use," and in Count Two with making false statements to obtain a passport. [Id. at 13-14, 16-17]. Kealy also understood that as a result of her conviction, she "may be removed from the United States, denied citizenship and denied admission to the United States in the future" and that neither the Court, her attorney, nor the prosecutor could tell her "what happens, that's a whole separate proceeding." [Id. at 15-16, 18].

3

Kealy understood that she faced possible maximum sentences of five years of imprisonment on Count One and another ten years on Count Two. [Id. at 15, 17-18]. The Court explained that it would take into account the United States Sentencing Guidelines and that it could impose a sentence above or below the guideline range. [Id. at 18-19]. Kealy understood that if her sentence is more severe than she expected, she would have no right to withdraw her plea. [Id. at 20]. The prosecutor then summarized what the evidence would show if the case went to trial, including that Kealy "was known as Gloria Yemisi Olunwuni [as a child,] . . . grew up in Nigeria[, and] . . . entered the United States illegally as early as 1988"; that she submitted a "credit application for a car loan . . . where she falsely listed Social Security number ending 7062 as her own Social Security number when she knew it was not"; and that she applied for a United States passport using Doreen Judd's ("D.J.") identifying information "even though she knew that she was not D.J." [Id. at 21-22]. Kealy agreed with the prosecutor's description of her crimes and admitted that she was guilty of the offenses alleged in Counts One and Two. [Id. at 22-23]. The Court accepted Kealy's plea. [Id. at 24].

At sentencing, Melnick explained that "[t]he reason that [he] told Ms. Kealy that [he] felt like it was in her best interest to enter the plea in this case, . . . is because at

4

[the time she applied for the car loan] she certainly had information that this Social Security number may be in question . . ..” [Doc. 69 at 6]. The government objected to Kealy receiving credit for acceptance of responsibility. [Id. at 11-13]. The Court sustained the government's objection, noting:

> I don't believe [Kealy] has truly accepted responsibility. She continues to lie about who she is and who she thinks she is. This is not about who her true mother or father were or who her grandmother was. To me it just boils down to the fact that she stole Doreen Judd's identity. She has been using it for decades, and she won't admit it.

[Id. at 28-29]. The Court imposed a sentence of six months of imprisonment for each count, to run concurrently, and to be followed by three years of supervised release. [Id. at 40; Doc. 60].

In her timely filed § 2255 motion, as amended, Kealy argues that Melnick was ineffective for failing to inform her of the 'truly clear' immigration consequences of her guilty plea.[1] [Doc. 78 at 5; Doc. 78-1 at 2-8; Doc. 98 at 2-8]. The government responds that Kealy's ground for relief is not supported by the record. [Doc. 83 at 12-

---

[1] In her original § 2255 motion, Kealy also alleged that Melnick was ineffective for incorrectly advising her that lack of intent was not a defense to the charged offenses, [Doc. 78 at 6; Doc. 78-1 at 9], but she abandoned that claim in her amended motion. See [Doc. 98 at 1 n.1].

5

15].  The Court found that an evidentiary hearing was necessary to resolve her claim, [Doc. 92], and that hearing was held on January 7, 2016.  [Doc. 106].

In her post-hearing brief, Kealy argues that the immigration consequences of her guilty plea were "truly clear" due to the factual basis offered at the plea hearing and statements made in her presentence investigation report ("PSR"), and therefore, Melnick was ineffective for failing to correctly advise her of those consequences, and Kealy asserts that she would not have pleaded guilty had she understood that she would almost certainly be removed from the United States.  [Doc. 107 at 14-42].  The government responds that Kealy has never conceded that she is not a United States citizen, that the deportation consequences of her guilty plea were thus not "truly clear," that Melnick gave her accurate advice, that she understood that she may be deported, and that she can not show prejudice.  [Doc. 108 at 13-21].  Kealy replies, in pertinent part, that her belief that she is a United States citizen did not relieve Melnick of his duty to provide accurate advice regarding the immigration consequences of her guilty plea and that he failed to do so.  [Doc. 111 at 6-15].

6

## II.  DISCUSSION

### A.  **Legal Standards**

A federal prisoner may file a motion to vacate his sentence "upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack."  28 U.S.C. § 2255(a).  "[T]o obtain collateral relief a prisoner must clear a significantly higher hurdle than would exist on direct appeal."  United States v. Frady, 456 U.S. 152, 166 (1982) (footnote omitted).

The standard for evaluating ineffective assistance of counsel claims is set forth in Strickland v. Washington, 466 U.S. 668, 687 (1984).  The analysis is two-pronged. However, a court need not address both prongs "if the defendant makes an insufficient showing on one."  Id. at 697.  A defendant asserting a claim of ineffective assistance of counsel must first show that "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance."  Id. at 690.  A court analyzing Strickland's first prong must be "highly deferential" and must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  Id. at 689; Atkins v. Singletary, 965 F.2d 952,

7

958 (11th Cir. 1992) ("We also should always presume strongly that counsel's performance was reasonable and adequate. . . .") (citation omitted). Counsel is not incompetent so long as the particular approach taken could be considered sound strategy. <u>Chandler v. United States</u>, 218 F.3d 1305, 1314 (11th Cir. 2000) (en banc); <u>see also</u> <u>Waters v. Thomas</u>, 46 F.3d 1506, 1512 (11th Cir. 1995) (en banc) ("[A] petitioner seeking to rebut the strong presumption of effectiveness bears a difficult burden.").

Second, a defendant must demonstrate that counsel's unreasonable acts or omissions prejudiced him. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." <u>Strickland</u>, 466 U.S. at 691. In order to demonstrate prejudice, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Id.</u> at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Id.</u>

To succeed on a claim that a guilty plea was obtained as the result of ineffective assistance of counsel, a § 2255 movant must show that the advice he received from counsel "fell below an objective standard of reasonableness" and "that there is a

8

reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Hill v. Lockhart, 474 U.S. 52, 57, 59 (1985) (citations omitted). Kealy has the burden of affirmatively proving prejudice. Gilreath v . Head, 234 F.3d 547, 551 (11th Cir. 2000).

**B.    Summary of Relevant Evidentiary Hearing Testimony**

John H. Bearden ("Bearden"), who has been in a relationship with Kealy for the past two years, testified that Kealy's first attorney, Corrine Mull ("Mull"), advised them that the government had offered Kealy two years of incarceration followed by mandatory deportation. [Doc. 106 at 5-6]. Bearden stated that Kealy rejected the offer due to the mandatory deportation. [Id. at 6]. According to Bearden, they then hired Melnick, who told them that he had negotiated a deal with the prosecutor wherein the mandatory minimum jail time and deportation were removed. [Id. at 7-8]. On cross-examination, Bearden testified that Kealy told him that she was born in this country and has never told him that she was not a United States citizen. [Id. at 10].

Kealy also testified that the offer she received through Mull was two years of imprisonment followed by deportation and that she rejected that offer because she "was born here." [Id. at 17-18]. Kealy stated that she then hired Melnick, who "was pretty sure he could help [her] not get jail time and not be deported." [Id. at 18-19].

9

After retaining Melnick, Kealy advised him in an email that she would not "roll over and accept two years and deportation to a random country." [Id. at 21]. Kealy testified that, despite her instructions to Melnick that she wanted to proceed to trial, he sought an offer from the government with no jail time or "recommendation to be referred to immigration." [Id. at 22-23, 28]. Kealy sent an email to Melnick, asking for a draft of the plea agreement and expressing reluctance to accept the offer. [Id. at 23-24]. Kealy claims that Melnick assured her that the proposed plea agreement would not "impact [her] immigration." [Id. at 25]. Although Melnick advised her that it was unnecessary, she consulted with immigration attorney Janise Miller ("Miller") prior to her guilty plea and Miller advised her that "the plea agreement does not require immediate deportation." [Id. at 26-27]. Kealy's understanding was that immigration was not part of her plea, but was "a separate mater." [Id. at 29-30]. Kealy testified that she accepted the offer based on Melnick's advice and because deportation "was now off the table." [Id. at 30].

Kealy read the plea agreement, including the provision regarding immigration consequences, which gave her pause, but Melnick explained that it was a standard provision. [Id. at 31-33, 45]. Kealy testified that she responded "yes" to the Court's questions at the plea hearing concerning her understanding of the plea agreement,

AO 72A
(Rev.8/82)

including its possible impact on her immigration status, because Melnick had instructed her to do so.  [Id. at 35-37].  Kealy further testified that she did not "understand that it was virtually certain that [she] would be removed from the country based on [her] convictions" and that she would not have pleaded guilty had she understood that but would have insisted on going to trial.  [Id. at 39].

On cross examination, Kealy acknowledged that she has "never told anyone[, including Melnick, that she is] not a U.S. citizen[] . . . just . . . that [she] was born here and that's all [she] knew[]" and further explained that she "thought being born here meant that [she] was a U.S. citizen."  [Id. at 46].  Kealy asserted that Josie Wortham, her alleged grandmother, told her that Rubyjean Wortham, whom Kealy had never met, gave birth to Kealy in the United States and that Rubyjean's midwife adopted Kealy.  [Id. at 46, 49, 56-57].  The government confronted Kealy with her 1991 passport application, which she completed in D.J.'s name, and with her 2007 affidavit in her son's alien file wherein she falsely swore that she moved to Nigeria with Rubyjean Wortham in 1985.  [Id. at 48, 53, 55, 57].  Kealy responded that Josie Wortham prepared and submitted the 1991 passport application on Kealy's behalf and that an attorney completed the 2007 affidavit.  [Id. at 58-59].  However, Kealy admitted that

11

she signed both the application and the affidavit and was twenty-one years old when she submitted the 1991 passport application.  [Id. at 48, 58, 61].

Melnick testified that Kealy told him that she was born in the United States and was a United States citizen.  [Id. at 64].  Melnick explained, however, that the "case is very complicated as it pertains to the immigration status of Ms. Kealy because there is a contention [supported by documentary evidence the authenticity of which Kealy disputes] that she was actually born in Nigeria and she is not at all a United States citizen."  [Id.].  Accordingly, Melnick advised Kealy that "if she were not a citizen of the United States[,] . . . deportation proceedings would be taken against her," but if she were, the disposition of her criminal case would have "no impact upon her ability to remain in the country."  [Id. at 65].  Melnick further advised Kealy that "even if she were to take this case to trial and found not guilty, if she were not a citizen of the United States that the Department of Immigration and Naturalization . . . could initiate deportation proceedings against her."  [Id.].  This advice was also reflected in an email from Melnick to Kealy, which Kealy admitted having received and read prior to her guilty plea.  [Id. at 14-15, 68].  Melnick explained that the government had agreed to drop the charges that carried a two-year mandatory minimum sentence and that he "felt that this plea agreement was absolutely in [Kealy's] best interest."  [Id. at 69-70].

12

Melnick confirmed that the removal language in the plea agreement did not make removal mandatory or automatic.  [Id. at 86].

## C.   **Analysis**

When the "deportation consequences" of a guilty plea are "truly clear," defense counsel has a duty to so inform his client.  Padilla v. Kentucky, 559 U.S. 356, 369 (2010).  However, when "the deportation consequences of a particular plea are unclear or uncertain[,] . . . a criminal defense attorney need do no more than advise a noncitizen client that pending criminal charges may carry a risk of adverse immigration consequences."  Id.  Furthermore,

> the representations of the defendant, his lawyer, and the prosecutor at [a guilty plea] hearing, as well as any findings made by the judge accepting the plea, constitute a formidable barrier in any subsequent collateral proceedings.   Solemn declarations in open court carry a strong presumption of verity.   The subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible.

Blackledge v. Allison, 431 U.S. 63, 73-74 (1977).

Notwithstanding her credibility issues,[2] Kealy has consistently claimed that she

---

[2]  The District Court noted at sentencing that Kealy "continues to lie about who she is and who she thinks she is. . . . [S]he stole [D.J.]'s identity.  She has been using it for decades, and she won't admit it."  [Doc. 69 at 28-29].  Kealy stuck to her story at the evidentiary hearing, unconvincingly.  Moreover, Kealy admitted signing a passport application and an affidavit, both of which she knew contained false

13

is a United States citizen, and her persistence in repeating this claim of citizenship to Melnick and everyone else rendered the deportation consequences of Kealy's guilty plea uncertain. Indeed, as Melnick explained during his testimony at the evidentiary hearing, the issue of the deportation consequences of her plea was complicated by Kealy's insistence that she is a United States citizen and by documentation, which she disputes, showing that she was born in Nigeria. [Doc. 106 at 64]. Since Kealy adamantly maintains that she is a United States citizen, despite evidence to the contrary, there was, and remains, a genuine factual dispute regarding her citizenship, and were she ultimately successful in persuading immigration officials or a court of her claim to United States citizenship, she could not be deported, just as Melnick advised her.[3]  See Agosto v. INS, 436 U.S. 748, 758-60 (1978) (holding that petitioner's claim

---

information, [Doc. 106 at 48, 53, 55, 57-58, 61], and Kealy's explanation that others prepared these documents fails to excuse her own responsibility for signing and using the false documents, which undermines her credibility. [Id. at 58-59]. Thus, Kealy has admittedly been untruthful under oath, and her testimony at the evidentiary hearing was undermined by her history of falsehoods. Accordingly, where Kealy's testimony conflicts with Melnick's testimony, the Court credits the testimony of Melnick, the more credible witness.

[3] Citing United States v. Al Halabi, No. 11-4884, 2015 WL 8591935 (2d Cir. Dec. 14, 2015), and United States v. Ramiro, 548 F. App'x 458 (9th Cir. 2013), Kealy contends that Melnick "affirmatively misadvised her by informing her that the convictions would not impact her immigration status because 'INS is a whole separate entity,' and any immigration proceedings would be separate and unrelated to her guilty

14

to citizenship, despite credibility issues, presented a disputed issue of fact that required *de novo* judicial review of the citizenship claim).

Contrary to Kealy's assertions, her guilty plea alone did not foreclose her claim of United States citizenship because alienage is not an essential element of the offenses to which she pleaded guilty,[4] the factual basis offered at her plea hearing did not

plea." [Doc. 111 at 4]. However, Kealy's reliance on these cases is misplaced because the non-citizenship of those defendants was uncontested, so the deportation consequences of their convictions were truly clear, unlike the unique circumstances presented here. Moreover, while Kealy cites email communications from Melnick to support her contentions regarding his alleged misadvice, Melnick credibly testified at the hearing that he told Kealy that "if she were not a citizen of the United States[,] . . . deportation proceedings would be taken against her," but if she were, the disposition of her criminal case would have "no impact upon her ability to remain in the country." [Doc. 106 at 65].

[4] See United States v. Harris, 376 F.3d 1282, 1291 (11th Cir. 2004) (The elements of an offense under § 408(a)(7)(B) "are (1) false representation of a Social Security number, (2) with intent to deceive, (3) for any purpose."); United States v. O'Bryant, 775 F.2d 1528, 1535 (11th Cir. 1985) ("[18 U.S.C. §] 1542 proscribes 'willfully and knowingly' making a false statement in a passport application. The crime is complete when one makes a statement one knows is untrue to procure a passport."). Kealy cites Houghton v. Att'y Gen. of U.S., 277 F. App'x 205 (3d Cir. 2008), in support of her contention that she is precluded from arguing that she is a citizen after pleading guilty to making a false statement in a passport application. In Houghton, the defendant was convicted following a jury trial of making a false statement in a passport application, in violation of § 1542, and the Third Circuit ruled that "[t]he jury's conclusion that Haughton lied on his passport application about his citizenship was essential to its conviction of Haughton and is now preclusive on the question of his alienage." 277 F. App'x at 207. However, unlike in Houghton, Kealy's citizenship was not central to her guilty plea. Although Count Two of the

15

concede that she is an alien,[5] and her alienage has never been established.  [Doc. 68 at

13, 16, 21].  Moreover, Melnick's alleged failure to object to statements contained in

the PSR is not relevant to the issue of whether he provided constitutionally adequate

advice prior to the plea hearing.[6]  At the evidentiary hearing, Kealy confirmed that she

_____

indictment included the allegation that Kealy falsely stated that her place of birth was Maryland, [Doc. 1 at 2], the factual basis for her guilty plea to Count Two was that she falsely impersonated D.J. to obtain the passport. See [Doc. 47-1 at 6-7; Doc. 53 at 21-22].  Thus, there was no admission or determination of Kealy's citizenship that was central to her guilty plea.

[5] The factual basis for Kealy's plea did state that she "grew up in Nigeria," and that she "entered the United States illegally at least as early as 1988," but it did not state where she was born or identify her citizenship.  [Doc. 68 at 21-22].  While these facts certainly call into question her claim of citizenship, they do not preclude Kealy from contesting the government's contention that she is not a citizen of the United States.  See Agosto, 436 U.S. at 758-60.  In fact, that is just what Kealy has done in this case, as she has continued to claim United States citizenship, even explicitly preserving her defense to removal, in her original and amended petitions, [Doc. 78-1 at 3 n.2; Doc. 98 at 3 n.3], in her motions and supporting briefs, [Doc. 79 at 1 n.1; Doc. 86 at 7-9, 11 n.2], and in her testimony at the evidentiary hearing. [Doc. 106 at 18, 46].  Based on her conduct in this case, the Court has little doubt that Kealy will continue to vigorously assert her claim of citizenship, necessitating an ultimate determination of alienage, which leaves the deportation consequences of her convictions unclear.

[6] Kealy asserts that because the District Court adopted the uncontested facts stated in the PSR, including a statement that she was born in Nigeria, she is precluded from contesting this fact in future removal proceedings. [Doc. 111 at 12].  However, she has cited no authority to support her contention, and she fails to note that the PSR also included the fact that she claims to be a United States citizen, [Doc. 65 at 16], and specifically stated that her country of birth was either the United States or Nigeria and that her citizenship was unknown. [Id. at 3].  Thus, the facts in the PSR adopted by the

16

had never told anyone, including Melnick, that she is not a United States citizen. [Doc. 106 at 46]. Moreover, Bearden testified that Kealy told him that she was born in this country and that she never claimed to be an alien. [Id. at 10]. Thus, since Kealy persisted in claiming United States citizenship throughout Melnick's representation of her, and it remains a contested issue of fact today, she was not "virtually certain" to be removed based upon her convictions, and the issue now before the Court is whether Melnick's advice was constitutionally adequate.

Melnick advised Kealy that if she were a United States citizen, she could not be deported, but if she were not, "deportation proceedings would be taken against her." [Doc. 106 at 14-15, 65, 68]. Melnick also told Kealy that, even if she took the case to trial and was found not guilty, she could be deported if she was not a United States

---

District Court revealed the disputed contentions regarding Kealy's citizenship, and that factual dispute was evident at the sentencing hearing and has continued to be contested in subsequent proceedings in this case, and the Supreme Court has held that a person claiming United States citizenship in deportation proceedings is entitled to a *de novo* judicial determination of that claim where there exists a genuine issue of material fact as to nationality. Agosto, 436 U.S. at 756-57 (concluding that testimony of petitioner and his adoptive parents that petitioner was born in United States and sent to live with family in Italy and that petitioner's maternal grandfather had petitioner's birth records falsified to prevent public knowledge of his illegitimate birth while permitting other family members to raise him was sufficient to create genuine issue of material fact, even though trier of fact could find such testimony incredible and despite documentary evidence showing that petitioner was born in Italy).

17

citizen.  [Id.].  This advice is plainly accurate, and, thus, Melnick fulfilled his

obligation to advise Kealy that her guilty plea "may carry a risk of adverse

immigration consequences."  Padilla, 559 U.S. at 369.  Moreover, the record shows

that Kealy understood that an immigration proceeding was probable.  [Doc. 47-1 at 4-

5; Doc. 68 at 7, 15-16, 18;[7] Doc. 106 at 46].  Accordingly, the Court finds that Melnick

provided Kealy constitutionally effective assistance.[8]

Additionally, even if Melnick's advice were found to be deficient, Kealy's

motion would still fail because Kealy has not shown prejudice.  The written plea

agreement, which Kealy admittedly read and signed, advised her that "removal is

presumptively mandatory" and that "no one, including her attorney or the district court,

[could] predict to a certainty the effect of her conviction on her immigration status."

---

[7] Although Kealy claims that she responded "yes" to the Court's questions at her plea hearing because Melnick instructed her to do so, [Doc. 106 at 35-37], her testimony at the plea hearing "carries such a strong presumption of accuracy that a district court does not, absent a substantial reason to find otherwise, abuse its discretion in discrediting later self-serving and contradictory testimony as to whether a plea was knowingly and intelligently made."  United States v. Juncal, 245 F.3d 166, 171 (2d Cir. 2001).  As noted earlier, the Court did not find Kealy to be a credible witness at the evidentiary hearing, so her testimony in support of her current motion does not discredit her testimony at the plea hearing.

[8] Additionally, it appears that Melnick fulfilled his alleged promise to Kealy and Bearden, in that the plea agreement did not require Kealy to agree to be deported. [Doc. 47-1; Doc. 106 at 7-8, 18-19].

18

[Doc. 47-1 at 4-5, 13-14; Doc. 68 at 2-3].   Kealy agreed that she wanted " to plead guilty regardless of any immigration consequences that her plea may entail, even if the consequence is her automatic removal from the United States."   [Doc. 47-1 at 5]. Moreover, the Court also advised Kealy that she may be removed from the country, and it is clear that she understood that admonition.[9] [Doc. 68 at 7, 15-16, 18; Doc. 106 at 46].   Thus, Kealy has not met her burden to show that she would not have pleaded

---

[9] Although Kealy asserts that "it is unclear whether a court should consider the plea agreement and colloquy in assessing prejudice," [Doc. 111 at 18], the Eleventh Circuit has considered both plea agreements and colloquies in determining prejudice. See United States v. Oliver, 522 F. App'x 525, 529 (11th Cir. 2013) (per curiam) (finding no prejudice based on counsel's failure to explain minimum consecutive sentences where both the plea agreement and the district court clearly advised defendant regarding the mandatory minimum consecutive sentences); United States v. Wilson, 245 F. App'x 10, 11-12 (11th Cir. 2007) (per curiam) (holding that a defendant could not establish prejudice where "any failure on the part of . . . counsel to clearly explain the possible punishment was cured by the district court" during the plea colloquy); Holmes v. United States, 876 F.2d 1545, 1549-50 (11th Cir. 1989) (defendant failed to show prejudice based on the court's failure to inform him of the mandatory minimum sentence where the written plea agreement, which defendant had admittedly read, signed, and understood, clearly reflected that defendant knew he would likely be sentenced to a term in excess of the mandatory minimum).   Kealy further maintains that neither the plea agreement nor the colloquy made clear to her that "she would inevitably be placed in removal proceedings based on her criminal convictions," but instead erroneously advised her that she "may" be removed and that no one could inform her of the "true consequences" of her plea.   [Doc. 111 at 20-22]. However, as previously noted, Kealy is not "virtually certain" to be removed given her insistence that she is a United States citizen, and thus, both the plea agreement and colloquy accurately advised her concerning the immigration consequences of her convictions.

19

guilty and would have insisted on going to trial had Melnick given her different advice on the immigration consequences of her convictions.  See United States v. Fazio, 795 F.3d 421, 428-29 (3rd Cir. 2015) (holding that defendant did not suffer prejudice based on counsel's immigration advice during the plea process because "any possible error in plea counsel's advice to [defendant] was cured by the plea agreement and at the plea colloquy"); Levy v. United States, Nos. 1:11-CR-0085-AT-JFK-5, 1:13-CV-3120-AT-JFK, 2015 WL 1893323, at *5 (N.D. Ga. Apr. 24, 2015) (concluding that movant had not established prejudice where he "signed a plea agreement that stated he wanted to plead guilty regardless of any immigration consequences, even if it meant automatic removal from the United States"), appeal filed, (No. 15-12246) (11th Cir. May 21, 2015);  United States v. Soriano-Garcia, Nos. 3:12cr83/MCR/EMT, 3:13cv616/MCR/EMT, 2014 WL 3057098, at *4 (N.D. Fla. July 7, 2014) (finding that defendant could not show prejudice under Strickland where the record, including the plea agreement and plea colloquy, established that defendant was aware of the immigration consequences of his plea), report and recommendation adopted at, *1. Because the evidence of record establishes that Kealy specifically affirmed in her plea agreement that she was aware that removal was presumptively mandatory and that she wanted to plead guilty regardless of any immigration consequences that her plea may

entail,[10] even if the consequence was her automatic removal from the United States, she has not shown that she suffered any prejudice from Mr. Melnick's allegedly ineffective assistance.  [Doc. 47-1 at 4-5].

## III.  CERTIFICATE OF APPEALABILITY

Rule 22(b)(1) of the Federal Rules of Appellate Procedure provides that an applicant for § 2255 relief "cannot take an appeal unless a circuit justice or a circuit or district judge issues a certificate of appealability under 28 U.S.C. § 2253(c)." Rule 11 of the Rules Governing Section 2255 Proceedings for the United States District Courts provides, "The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  Section 2253(c)(2) of Title 28 states that a certificate of appealability ("COA") shall not issue unless "the applicant has made a substantial showing of the denial of a constitutional right."  A movant satisfies this standard by showing "that reasonable jurists could debate whether (or, for that matter, agree that) the [motion] should have been resolved in a different manner

---

[10] Although, as Kealy points out in her post-hearing reply brief, [Doc. 111 at 23], the Court did not address this provision of the plea agreement in detail during her plea colloquy, she admittedly read, signed, and understood the plea agreement and thus, clearly understood this provision as well.  See Holmes, 876 F.2d at 1549-50.  Her testimony at the evidentiary hearing now contradicting her sworn statements at the guilty plea hearing is simply not credible for the reasons previously stated.

AO 72A
(Rev.8/82)

or that the issues presented were 'adequate to deserve encouragement to proceed further." Miller-El v. Cockrell, 537 U.S. 322, 336 (2003).

Based on the foregoing discussion of Kealy's grounds for relief, the resolution of the issues presented is not debatable by jurists of reason, and the undersigned recommends that she be denied a COA.

## IV.  CONCLUSION

For the foregoing reasons, **IT IS HEREBY RECOMMENDED** that this 28 U.S.C. § 2255 motion to vacate sentence, [Doc. 78], as amended, [Doc. 98], and a COA be **DENIED**.

The Clerk is **DIRECTED** to terminate the referral of the § 2255 motion to the Magistrate Judge.

**SO RECOMMENDED**, this 22nd day of February, 2016.

RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE

22